GEMSCO, INC. ET AL. *v.* WALLING, ADMINISTRA-TOR OF THE WAGE AND HOUR DIVISION, U. S. DEPARTMENT OF LABOR.

NO. 368.

Argued December 5, 1944.—Decided February 26, 1945.

*Messrs. Samuel S. Allan* and *Seymour D. Altmark,* with whom *Messrs. Walter Brower, Samuel J. Cohen, Coleman Gangel, Ilo Orleans* and *Myron P. Gordon* were on the brief, for petitioners.

*Mr. Archibald Cox,* with whom *Solicitor General Fahy, Messrs. Douglas B. Maggs, Louis Sherman* and *Kenneth Meiklejohn* were on the brief, for respondent.

Briefs were filed by *Messrs. Nathaniel L. Goldstein,* Attorney General of New York, *Orrin G. Judd,* Solicitor General, *Wendell P. Brown,* First Assistant Attorney General, and *Roy Wiedersum,* Assistant Attorney General, on behalf of the Industrial Commissioner of the State of New York, and by *Messrs. John H. Nolan,* Attorney General of Rhode Island, and *John J. Cooney,* on behalf of the State of Rhode Island and Providence Plantations, as *amici curiae,* in support of the respondent.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

The issue to be decided in these cases is narrow. It is whether respondent, as Administrator, has authority under § 8 (f) of the Fair Labor Standards Act, 52 Stat. 1060, to prohibit industrial homework as a necessary means of making effective a minimum wage order for the embroideries industry. The question arises in proceedings brought to review the order pursuant to § 10. The cases were consolidated for hearing in the Circuit Court of Appeals, which sustained the Administrator's action, one judge dissenting. *Guiseppi* v. *Walling,* 144 F. 2d 608. Because of the public importance of the question and its importance for purposes of administering the statute, certiorari was granted, 323 U. S. 695, limited to the stated issue.[1]

One of the Act's primary objectives was "a universal minimum wage of 40 cents an hour in each industry

---

[1] The petition sought review also on questions of due process and delegation of legislative power. Cf. note 10 *infra.*

engaged in commerce or in the production of goods for commerce" and to reach this level as rapidly as was "economically feasible without substantially curtailing employment." § 8 (a). Accordingly, § 6 established basic minimum statutory wages, to be stepped up from 25 cents an hour to 40 cents generally[2] during the seven years from the section's effective date, October 23, 1938. Limited flexibility was provided in accordance with the declared purpose to reach the 40-cent level earlier if "economically feasible." Cf. 83 Cong. Rec. 9256. Section 8 empowers the Administrator to convene industry committees which, after investigation, report to him their recommendations concerning minimum wages[3] and reasonable classifications. § 8 (a), (b), (c), (d). The Administrator is then required by order to approve and carry into effect the committee's recommendations, after notice to interested persons and opportunity to be heard, if he finds they "are made in accordance with law, are supported by the evidence . . . and . . . will carry out the purposes" of the section; otherwise he must disapprove them. § 8 (d).

The Act's scheme is therefore a combination of "statutory" minimum wages fixed by § 6 and what may be termed "committee" wages,[4] fixed by order made pursuant

---

[2] Section 6 (a) (3), cf. also § 8 (e) and text *infra* page 267, provides for issuance and continuance in effect of wage orders, to some extent at least, after the seven-year period: "Sec. 6 (a). Every employer shall pay to each of his employees . . . (3) after the expiration of seven years . . . not less than 40 cents an hour, or the rate (not less than 30 cents an hour) prescribed in the applicable order of the Administrator issued under section 8, whichever is lower . . ."

[3] "The committee shall recommend to the Administrator the highest minimum wage rates for the industry which it determines, having due regard to economic and competitive conditions, will not substantially curtail employment in the industry." § 8 (b). Recommendations for classifications are covered by § 8 (c).

[4] Cf. the concurring opinion of L. Hand, C. J., 144 F. 2d 608, 623. The combination is the result of a compromise, reached in con-

to § 8. The former prevail in the absence of special administrative action; the latter, when such action has been taken to prescribe for a specific industry a higher level than the generally prevailing statutory floor. The order in this case, entered on approval of the committee's recommendations, after notice and extensive hearings,[5] prescribed a minimum wage of 40 cents an hour, an increase

---

ference, of differences between the Senate and the House as to the structure of the bill. Cf. text *infra* at note 32.

[5] The Industry Committee (No. 45) was appointed June 6, 1942, and on June 30 following submitted its unanimous report and recommendations, for the 40-cent rate, to the Administrator. Published notice of public hearing was given September 16. The hearing extended over ten days of the following November. The Administrator broadened its scope to include the question "what, if any, prohibition, restriction, or regulation of home work in this industry is necessary to carry out the purpose of such order," etc.

Industry representatives, who appeared, were unanimous, with one exception, in supporting the committee's recommendation, but divided on restricting or prohibiting industrial homework. Labor representatives supported both proposals, as did representatives of federal and state agencies, including the Departments of Labor of the United States and of the States of New York and Rhode Island.

Extensive testimony was taken and many exhibits were received in evidence. In many of its aspects the Administrator found the evidence repetitious of that upon which previous findings were based approving the recommendations of an earlier industry committee (No. 15), which resulted in establishing the 37½-cent rate by order effective January 27, 1941. Oral argument was restricted to the question of homework, to which the greater part of the record of 1,691 pages relates. The procedure was substantially that which had been followed, upon the same question, in the cases of six other industries. See the Administrator's Findings and Opinion on the minimum wage recommendation of Industry Committee No. 26 for, and industrial homework in, the Jewelry Manufacturing Industry, dated October 16, 1941, and in relation to the Knitted Outerwear Industry (March 30, 1942), Women's Apparel Industry (July 8, 1942), Gloves and Mittens Industry (August 22, 1942), Button and Buckle Manufacturing Industry (September 19, 1942), and Handkerchief Manufacturing Industry (January 22, 1943).

of 2½ cents over the previously prevailing "committee" rate.[6] Petitioners have not contested this, the primary, term of the order.

In this statutory setting stands § 8 (f), the crucial provision which in material part is as follows:

"(f) *Orders issued under this section* shall define the industries and classifications therein to which they are to apply, and *shall contain such terms and conditions as the Administrator finds necessary to carry out the purposes of such orders, to prevent the circumvention or evasion thereof, and to safeguard the minimum wage rates established therein.* No such order shall take effect until after due notice is given . . ." (Emphasis added.)

## I

The narrow issue turns upon the scope properly to be given the emphasized portions of the section. Respondent says that this authorizes him to take whatever action he finds necessary to prevent circumvention or evasion of the order so that the wage rate it establishes may be safeguarded; and that in this case his findings, amply

---

[6] The provision for the 40-cent rate became effective September 20, 1943. The order provided the prohibition of homework should become effective after November 15, 1943. But the date was postponed, successively, until July 26, 1944, when the Circuit Court of Appeals stayed enforcement until this Court should act on the petition for certiorari.

The Administrator found that "the estimated direct increase in the wage bill resulting from the establishment of a minimum wage rate of 40 cents an hour would be 1.2 per cent in the three main areas and 2.6 per cent in the other areas." These findings are related to others to the effect that "almost 90 percent of the embroidery establishments are located in the New York City (including northern New Jersey), Chicago, and Philadelphia metropolitan areas. . . ." The Administrator concluded that "the insignificant rise in operating costs which will result from the recommended minimum will not cause substantial curtailment of employment." Cf. § 8 (b), (d).

sustained by the evidence, show prohibition of industrial homework is necessary to accomplish this end. As applied in this case, he has construed "necessary" not as meaning "helpful," "consistent," or "convenient," [7] but as connoting that the prohibition is absolutely essential to achieve those purposes. He says the wage rate cannot be maintained unless industrial homework is prohibited, with the comparatively minor exceptions the order allows.[8] His findings and indeed his express conclusions therefore necessarily determine that regulation, by measures short of prohibition, cannot accomplish the relevant purposes of the order and of the statute.[9]

---

[7] Cf. *Armour & Co.* v. *Wantock*, 323 U. S. 126.

[8] The exceptions relate to persons obtaining special homework certificates who are "unable to adjust to factory work because of" age, physical or mental disability or are unable to leave home because their presence is required to care for an invalid; and were engaged in industrial homework in the industry prior to November 2, 1942 (except that this requirement is not to be applied in cases of unusual hardship) or are engaged in such homework under the supervision of a state vocational rehabilitation agency or a sheltered workshop as defined in the Code of Federal Regulations.

[9] The Administrator's opinion reviews at length the conditions surrounding homework in the industry inevitably tending to produce violation of minimum wage requirements; and the efforts previously made under both state and federal legislation to overcome these tendencies by regulatory measures.

His conclusions, upon the evidence, were in general that both state and federal efforts at regulation had been ineffective; that violations were widespread, of great variety and in great part concealed; and that these were due to factors inherent in the conditions under which industrial homework is performed and impossible to correct by the regulatory measures applied.

The Administrator's review of efforts at regulation, by both state, cf. note 17 *infra,* and federal authorities prior to the Fair Labor Standards Act, led him to conclude "that labor conditions in industrial home work are not susceptible to regulation," and that, according to "the nearly unanimous viewpoint of Federal and State officials having experience in the administration of labor laws, . . . regulation, re-

Petitioners do not dispute the Administrator's findings of fact or that the evidence fully sustains them. Nor indeed do they question his conclusions in any respect except that he has no legal authority to make the prohibition.[10] The petition for certiorari conceded, as does also the brief, that the prohibition was included solely because respondent found "he could not [otherwise] enforce the minimum wage rate as to the home workers employed in the industry." The brief states further that petitioners, "during the entire course of the proceedings, . . . challenged only the statutory authority" of the respondent to include the prohibition.

In this sharply chiseled state of the issue, the accuracy of the Administrator's findings and conclusions and the sufficiency of the evidence to sustain them must be taken

striction or prohibition of industrial home work must be on a Nation-wide basis if minimum wage standards are to be preserved and upheld."

Likewise, "experience under the Fair Labor Standards Act of 1938 [to November, 1942] has also indicated that labor conditions in industrial homework in this Industry are not susceptible to regulation that will guarantee that the home worker will be paid the established minimum rate. . . . Compliance with the Act has been the exception rather than the rule." Cf. note 16 *infra*. Such homework, it is further concluded, "furnishes a ready means of circumventing or evading the minimum wage order for this Industry" and "mere regulation . . . including regulation of the record-keeping practices of employers or governmental establishment of piece rates will not be adequate to secure enforcement of the minimum wage order for the Embroideries Industry."

[10] In the petition for the writ of certiorari the only questions presented were (1) whether the statute authorizes inclusion of the prohibition as a "term and condition" of the wage order; (2) whether, if so, this delegation of authority is confined by adequate standards; and (3) whether the Fifth Amendment forbids Congress to authorize the prohibition "solely because of the inability to enforce the minimum wage rate applicable to homeworkers, without regard to the social and economic character of such employment." Cf. note 1 and text *supra*.

not only as true but as conceded, apart from the single question of authority to include the prohibition notwithstanding it is so buttressed in fact.[11] The posture of the case therefore compels acceptance of the Administrator's position that, without the prohibition, the wage rate cannot be maintained, and that circumvention and evasion cannot be prevented.

Furthermore, upon the findings that is true not only with reference to the employees who are themselves homeworkers. It is true also as to all other employees in the industry.[12] According to the best available estimates, the number of homeworkers at peak employment (April 1, 1939, to July 15, 1942) ranged from 8,500 to 12,000, whereas the number of factory workers as of June, 1942, was 18,500. The number of wage earners per factory in 1939 employed in some 1,431 establishments averaged between 12 and 13 workers.[13] Not only therefore is it im-

---

[11] By § 10, "The review by the court shall be limited to questions of law, and findings of fact by the Administrator when supported by substantial evidence shall be conclusive."

[12] The Administrator's report stated: "It was testified at the hearing that home work is cheaper in terms of labor costs than factory work and is used by employers to reduce production costs, despite the advantages derived from the direct supervision over production, standardization, and specialization which are possible in the factory. The evidence . . . conclusively shows that large proportions of home work employees . . . are paid less than the applicable minimum. It is apparent that if some employers are allowed to utilize home workers at subminimum wage scales, other employers compelled to pay a 40-cent minimum will be placed at a competitive disadvantage."

[13] The nature of homework, it was said, is such that estimates of the number of homeworkers in this industry are difficult, whereas by contrast employment figures for factory workers may be ascertained with ease and definiteness. The estimates stated are from data submitted by the Economics Branch, Wage and Hour Division, United States Department of Labor. The figures concerning the number of establishments and of factory workers were derived from the Census of Manufactures.

possible for the Administrator, without the prohibition, to follow the statute's mandate (§ 8 (d)) to "carry into effect" the recommendations of the committee as to 8,500 to 12,000 homeworkers, who generally are part-time piece-workers.[14] He neither can do so as to factory workers, who generally are full-time workers.

Hence, if the prohibition cannot be made, the floor for the entire industry falls and the right of the homeworkers and the employers to be free from the prohibition destroys the right of the much larger number of factory workers to receive the minimum wage. This is true not merely as a matter of inference from evidence having only prospective and predictive value. It is proved conclusively by the Administrator's experience in attempting by regulatory methods to secure compliance with the previously

---

[14] According to the report of the Economics Branch, cf. note 13 *supra*, entitled *The Current Status of Home Work in the Embroideries Industry*, October, 1942, one of the most important factors affecting earnings of homeworkers is "the great multiplicity of designs and styles." Variations are constant and short lived. Piece rates must be determined and applied with every change. Few operations lend themselves to standardization, especially for homework. In one instance, during a period of six months, a "lace-cutting firm received work requiring the cutting of 300 different designs, each of which had a different piece rate." The report further states: "Piece rates for plant workers can readily be checked . . . The setting of piece rates to yield the minimum wage for home workers is a much more complex problem than for plant workers."

The Administrator's opinion states the most common practice in setting piece rates for home operations is by the timing of a sample worker in the factory and the evidence showed this worker may be a very skilled and experienced one. Of the firms inspected by the Wage and Hour Division June 1, 1939, to July 1, 1942, "a review of 211 showed that 80, or 37.9 percent, fixed piece rates for home workers upon the basis of arbitrary estimates; 73, or 34.6 percent, based the rates for home workers on time tests of plant sample workers; and only 40, or 19 percent, based the rates for home workers on time tests of some of the home workers themselves." Cf. also note 16 *infra*.

prevailing [15] lower "committee" rate. [16]    His experience is borne out by that of state and federal authorities prior to the Fair Labor Standards Act. [17]    Attempts to maintain

[15] Cf. note 6 *supra*.

[16] Cf. note 9 *supra*.    The Administrator's report stated: "The Economics Branch found that even during the boom period from January 27, 1941 to July 1942, 61.2 percent of the home workers in the Industry as a whole were paid less than 37½ cents an hour, in violation of the applicable minimum wage order.  It was found that 52.6 percent of the home workers received less than 35 cents an hour; nearly 30 percent less than 25 cents; and 17.4 percent less than 20 cents.  Fifteen home workers, or 1.8 percent of the total number, were paid as little as 10 cents an hour or less.  The percentage receiving less than 37½ cents an hour was highest, 90.2 percent, in lace cutting and lowest, 23.3 percent, in crochet beading.  Miscellaneous embroidery · had 81.3 percent of the home workers receiving less than the wage order minimum, passementerie, 74.1 percent, hand embroidery, 72.6 percent, and Schiffli and Swiss hand-machine embroidery, 31.1 percent."

Much other evidence, including testimony of individual homeworkers and of the Director of the Women's Division, New York Department of Labor, relating to inspections made in 1941 and 1942 involving 1,582 homeworkers, sustained the Administrator's statement, "The evidence in the record, including the report of the Economics Branch, which showed low subminimum earnings for the bulk of the homeworkers in this industry, was not seriously contested at the hearing," and his further conclusions that, in view of competitive relationships, mere regulation of homework would not be adequate to secure effective enforcement of the order and, likewise, that this could not be had by applying the prohibition to only part of the industry.

[17] He found specifically that the efforts of New York and New Jersey in prohibiting distributors who operate no shops from distributing homework and in restricting such contractors, though having a beneficial effect, had not "changed the economic structure of the Industry as presently carried on"; that hidden child labor is a widespread characteristic of the system, discoverable only after extensive investigation presenting an almost insurmountable problem for enforcement agencies, employers and homeworkers themselves; that violations of record keeping regulations by employers and workers are consistent and widespread; and that "in view of the competitive relationship

minimum wages by regulating homework have failed generally of their purpose. This failure, after fair trial, is responsible for the Administrator's resort to prohibition in the present order.

The case therefore comes down squarely to whether or not minimum wages may be effectively prescribed and required in this industry. If homework can be prohibited, this is possible. If it cannot, the floor provided by the order cannot be maintained and, further, what is more important, it inevitably follows that no floor, whether of "statutory" or of "committee" wages, can be maintained.[18]

---

.between different types of embroidery, any regulatory, restrictive, or prohibitory order affecting only certain operations would create a competitive disadvantage for the employers engaged in those operations."

Noting that twelve states had legislated, before 1900, to regulate tenement workshops, the Administrator found that "effective enforcement was impossible, however, and home work remained a serious problem." The subsequent period of legislation by a few states "achieved little effective control prior to 1930." New state laws, enacted during the 1930's, providing for abolition of homework by administrative order, "became the only effective statutory approach to a problem generally considered beyond regulation." Under the National Industrial Recovery Administration, 118 of the 556 codes included homework provisions; and 86 percent of the 118 prohibited homework. Homework in consequence was greatly reduced, but its volume turned sharply upward when the National Industrial Recovery Act was declared unconstitutional in *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495 (1935).

[18] No reason is apparent which would make any factor in the homework situation effective to nullify the 40-cent rate that would not apply also to the 37½-cent rate or any other minimum, however fixed, except one placed so low that even homeworkers would seek other kinds of employment or accept idleness in preference. The Administrator made no findings or conclusions concerning this self-evident matter.

In this light petitioners' position is, in effect, that the statute cannot be applied to this industry. Their argument is not put in these terms. It comes to that. So to state it is to answer it. The industry is covered by the Act. This is not disputed. The intent of Congress was to provide the authorized minimum wage for each employee so covered. Neither is this questioned. Yet it is said in substance that Congress at the same time intended to deprive the Administrator of the only means available to make its mandate effective. The construction sought would make the statute a dead letter for this industry.

The statute itself thus gives the answer. It does so in two ways, by necessity to avoid self-nullification and by its explicit terms. The necessity should be enough. But the Act's terms reinforce the necessity's teaching. Section 8 (d) requires the Administrator to "carry into effect" the committee's approved recommendations. Section 8 (f) commands him to include in the order "such terms and conditions" as he "finds necessary to carry out" its purposes. These duties are backed up by other provisions.[19] When command is so explicit and, moreover, is reinforced by necessity in order to make it operative, nothing short of express limitation or abuse of discretion in finding that the necessity exists should undermine the action taken to execute it. When neither such limitation nor such abuse exists, but the necessity is conceded to be well founded in fact, there would seem to be an end of the matter.

## II

Petitioners' objections are not procedural. They have not contended that the provision of the order forbidding homework is a definition or classification of the industry

---

[19] Cf. text at note 38ff *infra*.

or, either for that reason or any other, must be submitted to the industry committee and made only upon its recommendation. Such a position would have nullified their argument that the statute confers no authority in any case to prohibit homework. The provision is neither a definition nor a classification of an industry. It relates merely to a mode or method of conducting the industry. The statute provides that the committee shall recommend minimum wage rates and reasonable classifications, and that the Administrator, if he disapproves "such recommendations," shall refer them either to the committee or to another committee. § 8 (a), (b), (c), (d). Nothing in the Act requires the Administrator to take the committee's recommendation concerning the terms and conditions found necessary to make their recommendation and the order based on it effective. He must find that the terms and conditions he imposes are necessary for this purpose. He did so in this case, after extended hearings, upon ample evidence and upon findings of necessity not questioned. To say that in such circumstances he can adopt no term or condition which materially alters the industry is only to say Congress did not mean what it said and that the industry cannot be made subject to the statute's regulation. It is also to ignore "the distinct separation of the functions to be performed by the committee under § 8 (a), (b), (c), (d), from that to be performed by the Administrator after submission of the committee's report . . ." *Opp Cotton Mills* v. *Administrator*, 312 U. S. 126, 147.

Petitioners' arguments rest chiefly on their views of the legislative history and the character of the prohibition. The latter, they say, is not a "method of enforcement" but is rather a form of "experimental social legislation" touching a matter not incidental to the order, but in the nature

of a wholly independent subject beyond the purview of the statute and therefore of the Administrator's power.

This argument is closely interlaced with the contentions drawn from the legislative history and the statute's enforcement provisions, presently to be noted. In so far as it is independent of these, however, it rests on wholly untenable premises. One is that the prohibition is merely an "enforcement" measure. It is rather primarily preventive in character, intended to aid in making the order effective and to eliminate the need for enforcement. But, in accordance with their "enforcement" conception, petitioners' larger fallacy is that the Administrator can take no action toward making his order effective which, if taken as a matter of independent legislation not expressly related to the Fair Labor Standards Act's objects, would produce substantially the same social and economic effects, apart from those objects. In this view the Administrator's power is so restricted that he can do nothing if, in addition to making the rate effective and safeguarding it against circumvention, other social and economic consequences would result.

The answer is obvious. Section 8 (f), in directing the Administrator to include "such terms and conditions" as he "finds necessary to carry out the purposes of such orders," did not forbid him to take the only measures which would be effective, merely because other consequences necessarily would follow. The language neither states expressly nor implies that he is to do only what will achieve the stated ends and nothing more. The statute does not direct the Administrator to make the rate effective by all necessary means except those which may have other social or economic consequences.

His power, it is true, is not one of social or economic reform, except as that power relates to maintaining authorized minimum wages and the statutory hours of labor.

But the Administrator has not exercised his authority for such an extraneous purpose. He expressly disclaimed any such object.[20] The entire record supports the disclaimer. The whole bearing of the evidence and the findings was toward the effects of homework upon the wage rate and its maintenance, not upon other evils it may generate. Petitioners' argument, not questioning the necessity for the prohibition or the finding that it exists, would accomplish indirectly what direct challenge which they do not attempt would achieve, if successful. Absent the necessity, the Administrator's power would not go to this length. Present that necessity, to deny it, because other effects necessarily but incidentally must follow his action, would be to nullify both his power and the statute. Nothing in the statute, whether of letter or of substance, warrants such a limitation. What is "incidental," what "independent" of stated statutory ends often presents a difficult issue. But that is seldom if ever true when to deny the authority or other feature questioned would nullify the Act by reading out of its purview the only means for making it effective.[21]

Homework in this case is not an independent industry. It is conducted largely by the same employers who maintain factory establishments or by "contractors" who are

---

[20] His opinion expressly states: "This proceeding is not concerned with the question whether home work is desirable or undesirable from a social point of view or as a form of economic organization. It is concerned solely with whether the home work system in the Embroideries Industry furnishes a means of circumventing or evading a wage order putting into effect the minimum wage recommendation of Industry Committee No. 45 so that it is necessary to provide in the wage order for its regulation, restriction or prohibition in order to carry out the purposes of such order and to safeguard the minimum wage rate established therein."

[21] Cf. *Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U. S. 381, 392; *United States* v. *Powers*, 307 U. S. 214, 217; *Armstrong Paint & Varnish Works* v. *Nu-Enamel Corp.*, 305 U. S. 315, 333; *Bird* v. *United States*, 187 U. S. 118, 124.

in competition with such employers. Homeworkers are an integral part of the single industry. Their labor competes with the labor of factory workers, within the same establishment, between establishments, and between regions where the industry is concentrated. The effects of their competition with factory workers are, as has been shown, to destroy the latters' right as well as their own to have, practically speaking, the benefit of the minimum wage guaranteed by the Act. They represent the smaller fraction of the industry, both in numbers and in working time. Such are the uncontested findings of fact.[22]

When all of these facts are taken into account, the case is clearly not an instance of effort to achieve ends beyond or independent of the statutory objects. It rather exhibits but an exercise of the necessary means to accomplish those objects. This is confirmed, further, by the evidence and the findings which show that the prohibition will not eliminate the great majority of homeworkers from the industry; but on the contrary will result only in transfer of the scene of their work from the home to the factory and will do this without undue hardship.[23]

---

[22] Cf. notes 12, 13 and text at notes 14 and 16 *supra*. Other relevant findings of the Administrator need not be quoted or noted specifically, reference being made to his opinion for them.

[23] The Administrator's opinion devotes some seventeen pages to review of the evidence in this aspect of the case, including previous experience with ability of both employers and homeworkers to adjust to the prohibition. This experience related to the effects of prohibitions under various state laws and the National Industrial Recovery Act. With reference to the latter, of 75 firms investigated by the Children's Bureau, Department of Labor, only one discontinued the line of goods on which homeworkers had been employed and of 3,135 homework employees prior to the prohibition, 2,588 or 82 percent were employed in factories after the prohibition. Similar results were shown in the experience with state laws in New Jersey, New York and Rhode Island.

Petitioners presented contrary evidence, largely statements of individual homeworkers in embroidery that they could not or would

For the larger number of workers unable to make the transfer, the exceptions allowed by the order will provide an adequate mode for permitting continuance of work at home.[24]

The argument from the legislative history undertakes, in effect, to contradict the terms of § 8 (f) by negative inferences drawn from inconclusive events occurring in the course of consideration of the various and widely differing bills which finally, by compromise and adjustment between the two Houses of Congress, emerged from the conference as the Act. The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction. This is such a case.

Petitioners' most insistent emphasis is upon two things. One is that the committee in charge of the original Senate bill reported that it was limited to two objectives, the establishment of minimum wages and maximum hours and the prohibition of industrial child labor.[25] The other, that at various stages of consideration the Senate bill contained, in the section (9 (6)) comparable to what is now § 8 (f), a parenthetical clause which expressly included

---

not make the transfer, for various reasons, if the prohibition were adopted. The Administrator found some of this evidence unacceptable "as furnishing a sound basis for predicating their actual conduct when faced with actual prohibition" and concluded that reasonable adjustment could be made to the prohibition both by employees and by the employers.

[24] Cf. note 8 *supra*. Because "relatively few home workers will be eligible to continue home work under this exception," the Administrator found that "no threat to the standards of the wage order" would be presented by making it.

[25] S. Rep. No. 884, 75th Cong., 1st Sess.; cf. 81 Cong. Rec. 7658, 7659.

homework among other specified practices the Administrator was authorized to restrict or prohibit,[26] and this clause was omitted from the final conference draft.

The first objection merely repeats in another guise the argument that homework is an independent subject matter wholly without the statute's purview, but bolsters this with the assumption that because oppressive child labor was covered expressly, homework and all other factors affecting maintenance of minimum wages were left entirely untouched, if they produce other evils which independent legislation might reach, merely because they were not also specifically mentioned. The assumption ignores the fact that the child labor provisions are themselves independent prohibitions, not limited to operation in situations where child labor has harmful effects on maintaining the minimum wage rate but working entirely inde-

---

[26] The clause assumed various forms in the course of consideration of the Senate bill. The section comparable to § 8 (f) was 9 (6). The original parenthesis, apparently, was inserted in committee in the form, "(including the restriction or prohibition of such acts or practices)." S. Rep. No. 884, 75th Cong., 1st Sess., 8. This was amended on the floor, without debate or record vote, to read, "(including the restriction or prohibition of industrial home work or of such other acts or practices)," thus introducing the first specific reference to homework. 81 Cong. Rec. 7891. The bill passed the Senate with the clause in this form. 81 Cong. Rec. 7957.

The House Committee on Labor approved and reported the Senate bill with this version of the parenthesis, which was retained through many revisions of the bill after it was recommitted. Eventually the clause was expanded in the House Committee to read, "(including the restriction or prohibition of industrial home work or such other acts or practices and such requirements as the keeping of records, labeling, periodic reporting and posting of orders and schedules)." House Confidential Subcommittee Print "A" of February 18, 1938. The clause disappeared entirely from the House bill when, shortly before passage, that body changed the entire scheme by substituting "statutory" for "committee" wages. Cf. H. Rep. No. 2182, 75th Cong., 3d Sess.; cf. also text *infra* at notes 32, 33.

pendently of such consequences.[27] Those provisions are therefore not merely means of putting into effect and maintaining the wages required by the Act, as is the Administrator's prohibition of homework. The former would apply regardless of any effect upon the wage structure. The latter can apply only when it is clear that such effects require this in order to maintain and safeguard that structure.

This difference is in fact the difference between end and means, made such by the terms of the statute itself. Congress by stating expressly its primary ends does not deny resort to the means necessary to achieve them. Mention of child labor therefore gives no ground to infer, from failure expressly to mention homework, that the latter was not included within the general language which comprehends all necessary means to achieve the Act's primary objects. Exactly the opposite conclusion must be drawn on the record, in view of the Administrator's uncontested findings concerning the effects of homework in producing hidden child labor at substandard wages, thus circumventing the Act in two of its primary objects.[28] These findings therefore give added reason to sustain his conclusion that homework was not put beyond his power to prescribe the means necessary to achieve the purposes of the order and of the Act.

---

[27] Cf. § 12 and § 3 (1). The latter defines "oppressive child labor." The former prohibits producers, manufacturers and dealers to "ship or deliver for shipment in commerce any goods produced in an establishment situated in the United States in or about which within thirty days prior to the removal of such goods therefrom any oppressive child labor has been employed . . ." See also note 17 *supra*.

[28] The Administrator, referring to the prohibition of § 12, cf. note 27 *supra*, noted that the employment of children in either factories or homes, in the production of goods for commerce, must be hidden and commented: "This in itself contributes to the deterioration of minimum wage standards."

The second objection fares no better. It is mere negative inference drawn from the bare fact that the illustrative parenthetical clause was omitted from the final conference draft which became the Act. Nothing in the committee or conference reports or in the debates indicates a purpose to put homework, or the other practices enumerated at one time or another within the parentheses, beyond the purview of the Act or of the Administrator's power wherever these practices are shown to prevent achievement of the statute's ends.

The answer to the argument microscopically made from the long course of legislative events is obvious. From the beginning the parenthetical clause was but illustrative of the general authority conferred by the provision of which it was a part.[29] It "grew up through step by step additions, among which 'homework' was one," 144 F. 2d 624, until the parenthetical illustrations threatened to swallow up the general authority. If nothing more had occurred than elimination of the illustrations from a bill otherwise accepted, the change well might be put down, as Judge Hand suggests, 144 F. 2d 624, "to the belief that it was unwise to specify so much, lest the specification be taken as exhaustive."

However, as he points out, the course of events was quite different, and even more conclusive against the petitioners' view. The section containing the parenthesis began, and continued, as a feature of the Senate bill. This followed an entirely different plan from the one eventually adopted, which was a compromise of Senate and House proposals. The Senate bill placed administration of the Act in the hands of a board, which was by order to fix all minimum wages. In this form, including the parenthetical reference to homework,[30] the Senate adopted the bill.

---

[29] Cf. note 26 *supra; Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 188ff, 211; *Federal Land Bank* v. *Bismarck Co.,* 314 U. S. 95, 100.

[30] Cf. note 26 *supra.*

The House Committee to which the measure was referred likewise approved it. But the House itself declined to do so. It adopted a different scheme, substituting statutory wages for wages fixed by order as the Senate bill proposed.[31] There was therefore no need for, and the House bill did not contain, the parenthesis or the general provision of which it formed a part.

When the two bills came to conference, compromise was worked out by writing around the conference table the final measure combining features of both bills.[32] The House provisions for an administrator and for statutory wages were retained. But the latter were modified by providing for "committee" wages, to be fixed by order of the Administrator, by including the provisions of § 8, including 8 (f), and also of § 6 (a) (3) and (4).

Section 8 (f), which originated in the Senate, thus found its way back into the final form of the measure, though without the parenthesis. The Conference report (H. Rep. No. 2738, 75th Cong., 3d Sess.) contains no reference to the elision and none appears in the record of the ensuing debate. 83 Cong. Rec. 9158, 9246. The history, accordingly, does not sustain the negative inference petitioners would draw from the omission. The paren-

---

[31] The House bill also substituted an administrator for the Senate's board. Petitioners argue from the fact that substitution of "statutory" for "committee" wages was made because the House objected to the discretionary powers given the board in the Senate bill, H. Rep. No. 2182, 75th Cong., 3d Sess., and because it later rejected substitute bills patterned after the Senate measure, cf. 83 Cong. Rec. 7389, 7378, 7373, that Congress, in effect, rejected every feature of the bills which the House refused to enact. The non sequitur is apparent. But it may be noted the contention ignores entirely the Senate's part in legislation, as well as the compromise effected in conference between the two bodies and the fact that this reintroduced some of the discretionary features contained in the bills the House rejected.

[32] Cf. 83 Cong. Rec. 9256; H. Rep. No. 2738, 75th Cong., 3d Sess. (Conference Report).

thesis was inserted, in the Senate, without discussion or controversy. It was likewise eliminated without discussion or controversy. So far as appears, it was never separately considered. Not the clause alone or particularly, but the entire bill containing it was rejected by the House.

That rejection is no evidence that this single feature had special significance. Rejection of an entire bill cannot be taken to be a specific rejection of each and every feature, more especially of those later reintroduced in the final draft.[33] The most tenable conclusion is drawn by Judge Hand, that "the section, which had apparently died with the Senate plan, was lifted out of that setting, and was put into the compromise bill as it had stood originally." As he says, "It would be indeed a far cry to infer from that that all the items which by accretion had made their way into the parentheses were in this way excised from the Administrator's powers. Indeed, if so—as he argues—he could not even regulate labels . . ." 144 F. 2d at 624.

The amendment to § 6, relating to homework in Puerto Rico and the Virgin Islands, adopted in 1940,[34] and Congress' failure in 1939 and 1940 to adopt an amendment proposed by the Administrator to authorize explicitly prohibition of homework[35] cannot operate retroactively, as is urged, to give the statute enacted in 1938 a different meaning from what it then acquired.[36] And petitioners' con-

---

[33] Cf. note 31 *supra*.

[34] Sections 6 (a) (5), 6 (c), 5 (e), added by Act of June 26, 1940, 54 Stat. 615, 616. Section 6 (a) (5) deals in detail with homeworkers in Puerto Rico and the Virgin Islands.

[35] Cf. H. R. 5435, 76th Cong., 1st Sess., § 4; H. Rep. No. 522, 76th Cong., 1st Sess., 8; 84 Cong. Rec. 3498; 86 Cong. Rec. 5122.

[36] It is not altogether clear, from the terms of the proposed amendment, cf. note 35 *supra*, whether its purpose and effect were to clarify preexisting provisions or to extend the Administrator's authority. The debate, 84 Cong. Rec. 6620–6622, indicates that opposition in the House was due primarily to belief that the amendment, if adopted,

tentions drawn from the Act's enforcement provisions misconceive their effect.

The idea seems to be twofold, first, that the Administrator has no enforcement functions under this Act; or, in any event, that the Act provides no means for enforcing the "terms and conditions," including restriction or prohibition of homework, which he may include in his order.[37]

The Administrator's function under § 8 (f), though primarily preventive, obviously is related to enforcement. And further, he is expressly granted powers bearing directly to that end. Apart from his investigative authority under § 11, he has power also by express provision of that section to bring suits under § 17 to restrain violations of wage orders.[38]

We need not determine whether this includes authority to sue independently to restrain violations of "terms and conditions" properly included in such an order or to ask for this relief as incidental to enjoining violations of the rate specified. Cf. *Hecht Co.* v. *Bowles,* 321 U. S. 321, 330; *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436, 461;

---

would "take away some of the exemptions that so-called farm people enjoy under the Act."

[37] It is said that § 8 (f) does not provide for a hearing with reference to the "terms and conditions" of a wage order and the failure of the Act to provide expressly for their enforcement, as it does for enforcement of orders issued under §§ 11 (c), 12 and 14, indicates "the statute did not include the prohibition of homework as a 'term and condition' of a wage order." The argument, it may be noted, applies to all "terms and conditions." In effect it urges that all are unenforceable; and therefore none was intended.

[38] Section 11 (a) provides: "The Administrator . . . may investigate . . . such facts, conditions, practices, or matters as he may deem necessary or appropriate to determine whether any person has violated any provision of this Act, or which may aid in the enforcement of the provisions of this Act. . . . Except as provided in section 12, the Administrator shall bring all actions under section 17 to restrain violations of this Act." Cf., e. g., *Walling* v. *Helmerich & Payne,* 323 U. S. 37; *Walling* v. *Belo Corp.,* 316 U. S. 624.

*United States* v. *Morgan*, 307 U. S. 183, 194; *Warner &
Co.* v. *Lilly & Co.*, 265 U. S. 526, 532.  But certainly the
absence of such authority cannot be assumed, closely re-
lated as it would be to enforcement of the order's primary
term.  Congress did not include authority to prescribe
"terms and conditions" merely as a preachment.  Cf. *Cali-
fornia Drive-In Restaurant Assn.* v. *Clark*, 22 Cal. 2d 287,
140 P. 2d 657.  We do not therefore consider further these
assumptions.

Finally, petitioners insist that power to prohibit home-
work could not have been intended because the authority
to prescribe "terms and conditions" applies only to "com-
mittee," not to "statutory" wages and will expire, by the
terms of § 8 (e),[39] on October 23, 1945, seven years from
the effective date of § 8.  This argument involves a medley
of assumptions and conclusions, some contrary to the fact,
others of doubtful validity.  Among them are the ideas:
(1) that the power to prescribe "terms and conditions"
applies only to "committee" wages; (2) that the power
to prescribe or maintain such wages expires altogether at
the end of the seven years; and (3), upon these hypothe-
ses, that it would be "absurd to assume that Congress in-
tended that the Administrator could make so disruptive
but temporary a regulation as the prohibition of home-
work would entail."

The last conclusion might be accepted, if its foundations
were solid.  But they crumble.  In the first place the

---

[39] "No order issued under this section with respect to any industry
prior to the expiration of seven years from the effective date of section
6 shall remain in effect after such expiration, and no order shall be
issued under this section with respect to any industry on or after such
expiration, unless the industry committee by a preponderance of the
evidence before it recommends, and the Administrator by a preponder-
ance of the evidence adduced at the hearing finds, that the continued
effectiveness or the issuance of the order, as the case may be, is neces-
sary in order to prevent substantial curtailment of employment in
the industry."

authority conferred by § 8 (f) is to be read, not as if it were given as of the date of the order (August, 1943) or the time when it may become effective,[40] but as of 1938, when the section took effect. Accordingly, at the minimum, the authority given was to apply over a period of seven years. And these were the most crucial, because the initial, years in the statute's anticipated life. The scope of the power was not cut down because the Administrator chose to try first the less effective, but similarly conferred though less extensive power of regulation.

Beyond this, it is not true that the power either to prescribe "committee" wages or to include "terms and conditions" in the order expires altogether at the end of the first seven years. Section 8 (e) expressly provides for continuance or issuance of wage orders after that time, whenever the industry committee recommends and the Administrator finds "by a preponderance of the evidence . . . that the continued effectiveness or the issuance of the order, as the case may be, is necessary in order to prevent substantial curtailment of employment in the industry." And § 6 (a) (3), perhaps also 6 (a) (4), expressly contemplates continuance of wage orders issued under § 8 after the initial seven years. The exact scope of these provisions need not now be determined. It is enough, for present purposes, that they leave some room, and it may be considerable, for the issuance or continued effectiveness of wage orders after October 23, 1945.

Finally, it is not necessary in this case to decide whether the power to prescribe "terms and conditions" applies only to "committee" wages and not to "statutory" wages. Strong reasons have been suggested for believing it applies to both.[41] But this case involves only "committee"

---

[40] Cf. note 6 *supra*.

[41] Cf. the opinion of L. Hand, C. J., 144 F. 2d 608, 623, and the reservation in that of Frank, C. J., at 614, with the authorities he cites in note 7.

wages. The power to make them effective and to prevent evasion would not be cut down, were it more clear than it is that there is no authority to prescribe "terms and conditions" for "statutory" wages or were it true that authority to require "committee" wages would expire altogether with the initial seven-year period. The question whether the authority to prescribe "terms and conditions" applies to "statutory" wages may be left for decision when it arises. Uncertain as the answer now is, it cannot give solid ground for inference that the power to prohibit homework was not a necessary means of making effective the minimum wage prescribed by the order.

Petitioners' arguments have been directed chiefly to the power to prohibit. If valid, they would apply equally to the authority to restrict or regulate. They would nullify the Administrator's power to establish or maintain minimum wages in the embroideries industry. They can have no such potency.

The judgments are

*Affirmed.*

MR. JUSTICE FRANKFURTER, concurring.

The Fair Labor Standards Act gives the Administrator charged with its enforcement power to fix wages so that they attain a basic minimum rate. In view of the vast and varied range of situations thus placed under his wage-fixing authority, the Administrator naturally enough was given by Congress the power to issue these wage orders on "such terms and conditions as the Administrator finds necessary to carry out the purposes of such orders, to prevent the circumvention or evasion thereof, and to safeguard the minimum wage rates established therein." § 8 (f), 52 Stat. 1060, 1065, 29 U. S. C. § 208 (f). It would disregard the authority thus given by Congress to deny that the power to fix minimum wages carries with it the subsidiary power to forbid and to prevent evasion of

wages so fixed. In the light of the showing made on this record concerning the embroideries industry for which the Administrator concededly fixed valid wage rates, the measures that the Administrator took through provisions dealing with homework in the embroideries industry were relevant to, and in enforcement of, the subsidiary power granted by Congress to prevent evasion of the rates fixed for that industry.

And so I join in the Court's opinion.

MR. JUSTICE ROBERTS.

With deference I venture to think that the Court here essays to read into the law what its words, fairly construed, do not import. The Court arrives at that result by forming a judgment as to what Congress probably should have said, and would have said, if it had considered the matter, in order to make the statute what the Court deems a more perfect instrument for attaining the general objective which Congress sought to attain, and then makes the necessary additions to the language Congress has used. The principal, if not the only argument I find in the opinion for reading something into the statute, is that otherwise it cannot be most effectively applied to certain industries unless the industries themselves are made over.

Section 8 (f) provides that the Administrator's orders issued under the section "shall define the industries . . . to which they are to apply." It is not suggested that the order in question is of this description. That with which the industry committee's investigation dealt was a single industry in which two methods of work were pursued. Obviously it is not a definition of the industry to exclude from it some of those who labor in it.

The section also provides that the Administrator's orders "shall contain such terms and conditions as the Administrator finds necessary to carry out the purposes of

such orders, to prevent the circumvention or evasion thereof, and to safeguard the minimum wage rates established therein." The philosophy of the court's opinion can be nothing less than that the Administrator may, if he finds it necessary, rewrite the statute. Suppose he finds that, in a given industry, it is, as he puts it, impossible to enforce the minimum wage provision. May he thereupon issue an order prohibiting the further prosecution of that industry and requiring all those who pursue it to follow some other calling? It may be said that the supposition is, on its face, ridiculous. But is it any more so than what was here accomplished? Forty per cent of the workers in an industry, under pain of otherwise losing their occupation, are compelled to give up what they have done time out of mind, and if they desire to pursue their calling to do so under completely changed economic conditions, not in their homes but in factories which, if they are available at all, may be remote from their homes.

The language of § 8 (f) has a reasonable and proper office in the context of the Act. The provisions permitted by that section to be inserted in an order are obviously such as are incidental to administration, such as pertain to keeping records or filing reports; not exorbitant or excessive so as to amount to a regulation or suppression of an existing and recognized industry.

In my view, one need not go outside the provisions of the Act to be convinced that Congress never intended to grant the Administrator the power he has assumed. If it be thought, however, that the phraseology of § 8 (f) is of doubtful import, the legislative history seems to me to demonstrate that Congress purposely, and not by inadvertence, denied the asserted power to the Administrator.

The statute aimed at three things—the limitation of the hours of work, the fixing of minimum compensation per hour, and the prohibition of child labor. We may elim-

inate from consideration the first and third of these objects, and the statutory provisions implementing them, since we are concerned only with minimum wages. The Act creates a Wage and Hour Division in the Department of Labor and authorizes the appointment of an administrator to be in charge of it (§ 4). It requires the appointment of industry committees representing those engaged in any industry (§ 5). It requires every employer to pay every employe engaged in commerce, or in the production of goods for commerce, at the rate of not less than twenty-five cents an hour for the first year, not less than thirty cents an hour during the next six years, and not less than forty cents an hour after the expiration of seven years. The Administrator is given no authority to issue any orders concerning these prescribed rates or their application in industry, with the sole exception about to be mentioned.

Provision is made to raise wages above the prescribed minima during the seven year period after the effective date of the Act, without curtailing employment or disrupting the economy of an industry. Section 6 refers the reader to § 8 creating machinery to accomplish this. The latter section provides for the convening of industry committees to which the Administrator shall refer the question what minimum wage rate shall be set for the industry. The committee is to investigate conditions in the industry, hold hearings, and recommend the highest minimum wage rates which it determines, having regard to economic and competitive conditions, will not substantially curtail employment.

Upon receiving the committee's recommendation, the Administrator, after an opportunity for hearing, may approve or disapprove the committee's recommendation. If he approves, he shall do so by an order the effect of which is to put into force the recommended wage scale. Such orders are not to continue in force after seven years from the effective date of the statute unless the committee

and the Administrator conclude, and so declare, that it is within the purposes of the Act that the wage fixed by the order shall remain in effect after expiration of that period notwithstanding the requirement of § 6 that all wages shall reach the minimum of forty cents an hour at that time.

Now it is only in enforcement of a committee's report that the Administrator has power to issue an order with respect to wages, and it is in this context that § 8 (f) permits him to include in his order "such terms and conditions" as he "finds necessary to carry out the purposes" of the order, to prevent circumvention or evasion, and to safeguard the wage rates thereby established.

With respect to the minima fixed by § 6, which apply universally (except where the special procedure authorized by § 8 is invoked), the Administrator has no authority to issue orders such as that issued in this case. He cannot, because he finds it difficult to enforce the Act in an industry, either remake or suppress the industry. The result of the decision is that, in the exceptional case where a special rate of wages is set in advance of the prescribed rate, the Administrator may do what, in the generality of cases, he may not do. This circumstance gave one of the judges below so much trouble that he was willing to hold, in the teeth of § 6, that the Administrator might in all cases make such orders as that here in question. Thus, instead of writing in additional provisions in § 8 (f), as does this court, he was prepared to write in a new provision in § 6 to make the Act a complete and logical statute.

We have, then, this situation: With respect to any industry which has not been taken out of the provisions of § 6 by an industry committee's report and an Administrator's order, the Administrator cannot forbid home work. As respects an industry in which wages have been fixed by a committee, the Administrator has these sweep-

ing and destructive powers. And this, in spite of the fact that the committee is authorized and required to deal with the wages of the industry as a whole, and did so deal with them here. The committee never considered the question of an appropriate wage for the industry, under the conditions which would prevail, after the suppression of a substantial part of it by the Administrator's order. The interpretation now sanctioned of the Administrator's statutory authority to make orders "to prevent the circumvention or evasion" of the purposes of the Act, as including the power to make over the industry to which a wage order is to apply, thus defeats one of the most fundamental purposes of the Act. By § 8 no wage order is to be promulgated with respect to an industry unless the question of the minimum wage for the industry has been referred by the Administrator to the industry committee, and the conditions in the industry and the appropriate wage for it have been the subjects of investigation and report by the committee. The committee is specifically enjoined to recommend to the Administrator "the highest minimum wage rates for the industry which it determines, having due regard to economic and competitive conditions, will not substantially curtail employment in the industry." And by § 8 (d) the Administrator, before he promulgates a wage order, is required to find, after "taking into consideration the same factors as are required to be considered by the industry committee," that its recommendations will carry out the purpose of § 8. These requirements make it clear that the terms and conditions which § 8 permit the Administrator to attach to his wage orders do not include those which materially alter the conditions of the industry which must be considered and reported upon by the committee. Such requirements are futile if the Administrator, under guise of preventing evasion of a minimum wage order, which the committee has recommended, has power, on promulgating a wage

order, to change the industry into one which the committee has never investigated. The Administrator's action is in effect a subversion of the committee's report, whereas the Act contemplates a resubmission to the committee in such a case. *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126, 146–149.

Surely, if any such sweeping construction is to be given words having a narrower import, inquiry into the legislative history is of capital importance. That history, instead of being "wholly ambiguous" and furnishing a "dubious basis" for conflicting inferences, seems to me to be letter-clear.

The Presidential message urging enactment of this legislation states two objects: "To reduce the lag in the purchasing power of industrial workers" and to put an end to "the existence of child labor." Both purposes were to be accomplished "without creating economic dislocation." [1] Pursuant to this recommendation, Senate Bill No. 2475 was introduced and a similar bill, H. R. 7200, was introduced in the House. Joint hearings were held by Senate and House committees. Senate Bill No. 2475 was reported to the Senate. Those in charge of it on the floor repeatedly stated that the purpose was to limit the bill strictly to minimum wages, maximum hours, and child labor. There is no question that many experts in the field felt that the prohibition of home work was essential to the accomplishment of the objective of the legislation. In the joint hearings, the Secretary of Labor testified that power should be given to the administrative authority to "prohibit entirely the use of industrial home work." [2] In this connection the Secretary also advised that the administrative powers to be granted should be carefully defined by the Congress so that the Act would clearly state

---

[1] H. R. Report No. 1452, 75th Cong., 1st Sess., pp. 6–7.
[2] Testimony at Joint Hearings, pp. 184, 190, 196, 197.

them.[3]  The question of home work was again broached at the hearings at various points.  Notwithstanding this, the bill, as reported to the Senate, contained no provision for the prohibition of home work.  The measure was debated at length in that body.  As it then stood, § 9 (6), dealing with administrative orders, which became § 8 (f) in the bill as enacted, provided that an order might contain terms and conditions the administrative authority should find necessary to carry out the purposes of the order to prevent circumvention or evasion, or to "safeguard the fair labor standards therein established."  It will be seen that this language is not materially different in meaning from that finally embodied in § 8 (f).  An amendment was proposed from the floor to add the words "including the restriction or prohibition of industrial home work" and was agreed to.

In order to expedite the adoption of the legislation, the House Committee limited its consideration to the bill passed by the Senate and reported it favorably with amendments.  Without detailing the House proceedings, it is enough to say that ultimately a bill was presented largely embodying the provisions of Senate Bill No. 2475 but creating an administrator in lieu of a board.  Section 9 (6), which related to wage orders, contained the same provisions respecting prohibition of home work as the Senate bill.[4]

The objections to the Senate bill in the House were such that a new measure was reported establishing fixed minimum wages and maximum hours and granting the Secretary of Labor only the power to declare that a particular industry was "an industry affecting commerce" and so subject to the Act.  It contained no provision for administrative orders.  During debate on this proposed

[3] *Ibid.*, p. 195.
[4] 82 Cong. Rec. 1511–1516, 1572–1577, 1580, 1585.

bill a substitute was presented containing a section relating to wage orders, with provisions respecting home work the same as were contained in the Senate bill as passed and in the substitute theretofore offered to the House. The bill thus offered was rejected and the newly reported House bill was passed. Conferees were appointed amongst whom were the Senator who had first proposed the amendment respecting orders prohibiting home work and two of the Representatives who had presented bills containing similar provisions. The Conference Committee deliberated for a matter of twelve days and evidently gave the most meticulous care to each section of each of the bills before it. It in effect rewrote the measure. The Conference Report shows that the committee adopted the theory of the House bill fixing definite minimum standard wages to step up periodically in the future and also, as respects industry committees and interim orders based on industry committees' reports, adopted the more flexible system embodied in the Senate bill.

It is clear that in redrafting § 8 (f), which was § 9 (6) of the Senate bill, the conferees consciously and deliberately rejected the clause "including the restriction or prohibition of industrial home work or of such other acts or practices." The Conference Report was accepted, the bill passed both houses, and was signed by the President.

The Wage and Hour Division of the Department of Labor recognized that it had no power to abolish home work. In its First Annual Report, that Division stated (p. 14) that it was treating home workers as employes and not as independent contractors. In the same report (p. 31) the Division went into detail with respect to regulations for record keeping in respect of home work. At page 46, the Division said: "A difficult problem which has required the use of special inspectors and special techniques is that of industrial homework. It has been necessary to make elaborate and time-consuming investigations at the

establishment of the employer and in the homes of the workers." That Division cooperated in the drafting of a bill (H. R. 5435)[5] introduced by Representative Norton of the Labor Committee, which provided, *inter alia:* "The Administrator shall have power to make, issue, amend, and rescind such regulations and orders as are necessary or appropriate to carry out any of the provisions of this Act. Without limiting the generality of the foregoing, such regulations and orders may . . . make special provision with respect to, including the restriction of, home work subject to this Act to the extent necessary to safeguard the minimum standards provided in this Act or in any regulation or order issued pursuant thereto, . . ." The proposed amendment was debated at length and was defeated. With respect to it Representative Norton said: [6]

"I am sure that business would be less jittery about this law if the Administrator had the right to define the application of the law. Without this amendment he may not do so and some business has suffered as a result. I believe that he further needs the power to define technical and trade terms used in the act and the power to make special provisions with respect to industrial home work and make special provision for constant-wage plans consistent with section 7 relating to hours of work. Home work has long been a blot on the economic picture of this country, and I regret to say that in some cases employers have resorted to this means of employment to escape the provisions of this law."

Again she stated to the House:[7]

". . . we are proposing in section 4 of H. R. 5435 to authorize the Administrator to make rules and regulations to carry out any of the provisions of the act. This section

---

[5] First Annual Report, 1939, p. 160.
[6] 84 Cong. Rec. 3498.
[7] 86 Cong. Rec. 5122.

will also give him the right to define terms used in the act and make special provisions with respect to industrial home work.

"As the act is now written it is extremely doubtful whether the wage and hour standards which it establishes can be enforced as to industrial home workers. Under present practice in industrial home work industries, the Administrator is unable to secure proper records on wages and hours of home workers. Business concerns relying on home work for their labor do not ordinarily deal directly with the home workers but turn over the goods or articles on which the work is to be done to contractors who employ the home workers. If time permitted, I could give you concrete examples of cruelty in this field. Section 4 of the amendments would give the Administrator the necessary authority to cope with this situation."

In the Annual Report of the Wage and Hour Division for 1940 industrial home work was discussed at page 89 and statements made as to the requirements of record keeping in respect of it.

After the Wage and Hour Act had become law it developed that if the prescribed minimum hourly wages were enforced in Puerto Rico certain industries there, which consisted almost entirely of home work, would be destroyed. It was believed that the only relief which would correct the situation would be to amend the statute to abrogate the fixed minima named in § 6 to provide for an industry committee to fix lower standard wages for industries consisting largely of home workers in the island. Such minima would be recommended by an industry committee and implemented by orders of the Administrator.[8] The amendment was adopted in 1940.

---

[8] See Annual Report, Wage and Hour Division, 1940, p. 113; Hearings Senate Committee on Appropriations, Emergency Relief Appropriation Act, 1941, p. 3; S. R. 1754, 76th Cong., 3d Sess., p. 5ff; H. R. No. 2186, 76th Cong., 3d Sess., p. 15.

Far from indicating any thought on the part of Congress or the Division that the Administrator was empowered to ban home work, this legislation, taken in connection with the defeat of H. R. 5435, indicates quite clearly that no one concerned either in the passage or the administration of the law had any notion that the Administrator was authorized to deal with the economic problem involved in home work.

A section of the Wage and Hour Division's Report for 1940 contained a discussion of enforcement of the Act with respect to home work, without any suggestion that the Administrator could deal with it by abolishing it. (p. 89)

In the Report for 1941 the Division, for the first time, suggested that the Administrator had been considering, in connection with wage orders, the question: "Must homework be abolished as one of the terms and conditions of a wage order in order to safeguard and effectuate enforcement of the order." (p. 64)

Thus it appears that the Administrator, having failed to obtain explicit authority from Congress, began contemplating the effort to persuade the courts that he had implied authority in the premises.

In the Report for 1942 (p. 19) all that appears is the following:

"The problem of industrial homework has been one of the most important administrative questions since the inception of the Fair Labor Standards Act. For the guidance of the Administrator, the data were presented for the jewelry and knitted outerwear industries, showing conditions of industrial homework, the average earnings of homeworkers, the difficulties of enforcement of minimum wage provisions for homeworkers, and the methods of evasion of minimum wage regulations by workers and employers."

Though there was no declaration of a purpose to enter the sort of order now in question, it was, in fact, entered August 21, 1943.

In the Report for 1943, for the first time, Congress was apprised of action being taken (p. 19) thus:

"Enforcement measures established to protect the standards of the Act for factory employees have not been effective in controlling hours and wages of homeworkers. This failure prompted regulation of industrial homework under wage orders in industries in which homework is prevalent. These regulations are designed to protect factory employees against unfair wage competition.

"Industrial homework in these industries is restricted to persons who are unable to adjust to factory work because of age or physical or mental disability or who are home-bound because of an invalid in the home and who have been engaged in the particular industry prior to a specified date. This latter requirement may be waived in unusual hardship cases. These restrictions were adopted after searching examination of the subject which included the opinions and convictions of representatives of management and labor. A total of 4,451 applications for industrial homework certificates have been received and 3,701 certificates have been granted."

But, by that time, this case had been taken to the Circuit Court of Appeals to test the validity of the order here under review.

I would reverse the judgment.

The CHIEF JUSTICE joins in this opinion.