GORSUCH, Circuit Judge,
dissenting.
A trucker was stranded on the side of the road, late at night, in cold weather, and his trailer brakes were stuck. He called his company for help and someone there gave him two options. He could drag the trailer carrying the company’s goods to its destination (an illegal and maybe sarcastically offered option). Or he could sit and wait for help to arrive (a legal if unpleasant option). The trucker chose None of the Above, deciding instead to unhook the trailer and drive his truck to a gas station. In response, his employer, TransAm, fired him for disobeying orders and abandoning its trailer and goods.
It might be fair to ask whether Tran-sAm’s decision was a wise or kind one. But it’s not our job to answer questions like that. Our only task is to decide whether the decision was an illegal one. The Department of Labor says that TransAm violated federal law, in particular 49 U.S.C. § 31105(a)(1)(B). But that statute only forbids employers from firing employees who “refuse[ ] to operate a vehicle” out of safety concerns. And, of course, nothing like that happened here. The trucker in this *1216 case wasn’t fired for refusing to operate his vehicle. Indeed, his employer gave him the very option the statute says it must: once he voiced safety concerns, TransAm expressly — and by everyone’s admission— permitted him to sit and remain where he was and wait for help. The trucker was fired only after he declined the statutorily protected option (refuse to operate) and chose instead to operate his vehicle in a manner he thought wise but his employer did not. And there’s simply no law anyone has pointed us to giving employees the right to operate their vehicles in ways their employers forbid. Maybe the Department would like such a law, maybe someday Congress will adorn our federal statute books with such a law. But it isn’t there yet. And it isn’t our job to write one — or to allow the Department to write one in Congress’s place.
My colleagues suggest that the Department should be permitted to read the statutory phrase “refuse[ ] to operate” to encompass its exact opposite and protect employees who operate their vehicles in defiance of their employers’ orders. They justify this unusual result on the ground that the statutory phrase is ambiguous and so we owe the Department deference under step two of Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). But, respectfully, it seems to me Chevron is a curious place to turn for support given that the Department never argued the statute is ambiguous, never contended that its interpretation was due Chevron step two deference, and never even cited Chevron. In fact, the only party to mention Chevron in this case was Tran-sAm, and then only in a footnote in its brief and then only as part of an argument that the statute is not ambiguous. We don’t normally make arguments for litigants (least of all administrative agencies), and I see no reason to make a wholly uninvited foray into step two of Chevron land. See Comsat Corp. v. FCC, 250 F.3d 931, 938 n.7 (5th Cir. 2001); cf. SEC v. Chenery Corp., 318 U.S. 80, 94-95, 63 S.Ct. 454, 87 L.Ed. 626 (1943).
Even taken on its own terms, too, I find myself unpersuaded by the argument my colleagues devise for their invocation of Chevron step two. They say the statute is ambiguous because some of its terms (like “operate”) are not expressly defined by statute. Maj. Op. at 1211. But, respectfully, my colleagues do not cite any precedent for the notion that the absence of a statutory definition is enough to render a statutory term ambiguous — and I am aware of none. In fact, there are countless cases finding a statute unambiguous after examining the dictionary definition of its terms. See, e.g., Carcieri v. Salazar, 555 U.S. 379, 388-92, 129 S.Ct. 1058, 172 L.Ed.2d 791 (2009); Hackwell v. United States, 491 F.3d 1229, 1233-37 (10th Cir. 2007).
Doing just that here, it seems to me that the statute is perfectly plain — and plainly doesn’t capture the conduct here — just as TransAm suggests. The term “refuse” means “[t]o decline positively, to express or show a determination not to do something.” 8 The Oxford English Dictionary 495 (2d ed. 1989). Meanwhile, “operate” means “[t]o cause or actuate the working of; to work (a machine, etc.).” 10 id. at 848. Putting this together, employees who voice safety concerns about their vehicles may decline to cause those vehicles to work without fear of reprisal. And that protection, while significant, just does not give employees license to cause those vehicles to work in ways they happen to wish but an employer forbids. Indeed, my colleagues’ position would seem to require the addition of more than a few new words to the statute. In their view, an employee should be protected not just when he “refuses to operate a vehicle” but also when he “refuses to operate a vehicle in the *1217 particular manner the employer directs and instead operates it in a manner he thinks safe.” Yet those words just aren’t there; the law before us protects only employees who refuse to operate vehicles, period Imagine a boss telling an employee he may either “operate” an office computer as directed or “refuse to operate” that computer. What serious employee would take that as license to use an office computer not for work but to compose the great American novel? Good luck.
To be sure, my colleagues invoke the statute’s purposes — employee “health” and “safety” — and suggest the result they reach is consistent with them. After all, they note, the employee here who chose to defy his employer’s instructions and drive his truck as he thought best didn’t do so to write a novel or with some other esoteric end in mind, but because he bore safety concerns. Just the sort of employee safety concerns, my colleagues indicate, Congress intended to protect. Maj. Op. at 1211.
Even supposing all this is true, though, when the statute is plain it simply isn’t our business to appeal to legislative intentions. Gemsco, Inc. v. Walling, 324 U.S. 244, 260, 65 S.Ct. 605, 89 L.Ed. 921 (1945) (“The plain words and meaning of a statute cannot be overcome by legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction.”). And it is a well-documented mistake, too, to assume that a statute pursues its putative (or even announced) purposes to their absolute and seemingly logical ends. See, e.g., Hydro Res., Inc. v. EPA, 608 F.3d 1131, 1158 (10th Cir. 2010) (en banc); Barnhart v. Sigmon Coal Co., 534 U.S. 438, 460-62, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). Especially to ends as ephemeral and generic as “health and safety.” After all, what under the sun, at least at some level of generality, doesn’t relate to “health and safety”? The fact is that statutes are products of compromise, the sort of compromise necessary to overcome the hurdles of bicameralism and presentment. And it is our obligation to enforce the terms of that compromise as expressed in the law itself, not to use the law as a sort of springboard to combat all perceived evils lurking in the neighborhood. Maybe Congress found it easier to agree that an employee has a right to sit still in response to his employer’s order to operate an unsafe vehicle rather than try to agree on a code detailing when and how an employee can operate a vehicle in a way he thinks safe and appropriate but his employer does not. Maybe Congress would not have been able to agree to the latter sort of code at all. Or maybe it just found the problem too time consuming and other matters more pressing. Or maybe it just didn’t think about the problem at all. Whatever the case, it is our job and work enough for the day to apply the law Congress did pass, not to imagine and enforce one it might have but didn’t.
I respectfully dissent.