**VIACOM INTERNATIONAL INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

CBS Inc., American Broadcasting Companies, Inc., National Broadcasting Company, Inc., RCA Corporation, Overseas Tele Video Corporation, Intervenors.

No. 227, Docket 81–4119.

United States Court of Appeals, Second Circuit.

Argued Nov. 5, 1981.

Decided Feb. 9, 1982.

---

Daniel M. Armstrong, Associate Gen. Counsel, Washington, D. C. (Stephen A. Sharp, Gen. Counsel, C. Grey Pash, Jr., Lisa B. Margolis, Washington, D. C., of counsel), for respondent F.C.C.

George H. Shapiro, Washington, D. C. (Marilyn D. Sonn, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., of counsel), for petitioner.

Scott H. Robb, Robb & Kuhbs, New York City, for intervenor Overseas Tele Video Corp.

Timothy Dyk, Washington, D. C. (J. Roger Wollenberg, Thomas W. White, Wilmer, Cutler & Pickering, Joseph DeFranco, Mark W. Johnson, Washington, D. C., of counsel), for intervenor CBS Inc.

James A. McKenna, Jr., Washington, D. C. (Thomas N. Frohock, Dennis P. Corbett, McKenna, Wilkinson & Kittner, Washington, D. C., of counsel), for intervenor American Broadcasting Co.

Bernard G. Segal, Philadelphia, Pa. (Jerome J. Shestack, Schnader, Harrison, Segal & Lewis, Peter S. Greenberg, Deena Jo Schneider, Philadelphia, Pa., of counsel), for intervenors National Broadcasting Co. and RCA Corp.

Before WATERMAN, OAKES and MESKILL, Circuit Judges.

OAKES, Circuit Judge:

This administrative law case, occurring in an era of deregulation, presents several interesting questions concerning regulations of the television industry which were several years in the adopting and which have been in effect for a decade. The three national television networks obtained from the Federal Communications Commission (FCC) on June 23, 1981 a declaratory ruling

that the "financial interest" rule, 47 C.F.R. § 73.658(j)(1)(ii), does not prohibit them from acquiring rights to "nonbroadcast" uses of independently produced television programs—*e.g.*, on cable television, video cassettes, and video discs. Memorandum Opinion and Order, Request by CBS Inc., for a Declaratory Ruling, 87 F.C.C.2d 30 (1981). Viacom International, Inc. (Viacom), joined by intervenor Overseas Tele Video Corporation (Overseas), petitions for review of that FCC ruling. The four arguments they make on review are (1) that the ruling was not an interpretation but an amendment of the financial-interest rule, requiring the rule-making procedures of the Administrative Procedure Act; (2) that the Commission improperly relied on an internal staff memorandum; (3) that the Commission improperly failed to disclose publicly the content of ex parte communications, denying interested parties an opportunity to respond; and (4) that in any event the Commission's ruling was arbitrary, capricious, and an abuse of discretion. While the case is not without difficulty, we believe the Commission acted within its statutory and regulatory powers in compliance with

the Administrative Procedure Act and did not abuse its discretion. We therefore deny the petition to review.

## BACKGROUND

### I. *The Regulatory History*

The financial-interest rule was one of three rules proposed by the FCC on March 22, 1965 [1] after a six-year study of the lack of competitive sources of television programming.[2] After lengthy proceedings with comments from many parties, including a report prepared for the networks by Arthur D. Little, Inc. (Little Report) setting forth detailed data on industry program practices, the Commission adopted the three rules on May 4, 1970:[3] the "syndication" rule eliminating networks from domestic syndication and from foreign distribution of independently produced programs;[4] the "financial interest" rule prohibiting networks from acquiring additional rights to independently produced programs other than a license for network exhibition;[5] and the "prime time access" rule limiting the

1. Notice of Proposed Rulemaking, Amendment of Part 73 of the Commission's Rules and Regulations With Respect to Competition and Responsibility in Network Television Broadcasting, 45 F.C.C. 2146, 30 Fed.Reg. 4065 (1965) [hereinafter cited as Notice of Proposed Rulemaking].

2. *See* Order for an Investigatory Proceeding, 24 Fed.Reg. 1605 (1959).

3. *See* Report and Order, Amendment of Part 73 of the Commission's Rules and Regulations With Respect to Competition and Responsibility in Network Television Broadcasting, 23 F.C.C.2d 382 (1970) [hereinafter cited as Report and Order].

4. 47 C.F.R. § 73.658(j)(1)(i). This section provides:

   (j) *Network syndication and program practices.* (1) Except as provided in paragraph (j)(3) of this section [relating to educational, noncommercial, or public programming], no television network shall:

   (i) After June 1, 1973, sell, license, or distribute television programs to television station licensees within the United States for non-network television exhibition or otherwise engage in the business commonly known as "syndication" within the United

States; or sell, license, or distribute television programs of which it is not the sole producer for exhibition outside the United States; or reserve any option or right to share in revenues or profits in connection with such domestic and/or foreign sale, license, or distribution....

5. 47 C.F.R. § 73.658(j)(1)(ii). This section prohibits the networks from,

   (ii) After August 1, 1972, acquir[ing] any financial or proprietary right or interest in the exhibition, distribution, or other commercial use of any television program produced wholly or in part by a person other than such television network, except the license or other exclusive right to network exhibition within the United States and on foreign stations regularly included within such television network: *Provided*, That if such network does not timely avail itself of such license or other exclusive right to network exhibition within the United States, the grantor of such license or right to network exhibition may, upon making a timely offer reasonably to compensate the network, reacquire such license or other exclusive right to exhibition, of the program.

time allotted network programs during prime time.[6]

The three rules, the parties agree, were intended to operate together to promote diversity and competition in television programming. Each rule was targeted at a separate aspect of network domination of the television industry. The prime-time-access rule, note 6 *supra*, prohibited network-affiliated television stations in the fifty largest television markets from devoting more than three of the four hours of evening prime time to network programs or programs formerly on network television. By ensuring that such stations had at least one hour available each night to broadcast nonnetwork programs, the Commission sought to give independent program producers, including local stations, greater access to prime-time television.

The syndication rule, note 4 *supra*, prohibited the networks from distributing (*i.e.*, syndicating) television programs to domestic television stations for nonnetwork exhibition, distributing programs of which the network was not the sole producer for exhibition outside the United States, or participating in profit-sharing arrangements involving those distribution activities. Network programming is typically broadcast simultaneously by network-affiliated stations which are compensated by the network for presenting the programs. Nonnetwork or syndicated programming, by contrast, is generally licensed to individual stations which pay the syndicator for rights to independent exhibition. The syndication rule was imposed to keep the networks out of the syndication business, and thus to increase opportunities for independent pro-

ducers to provide programs for nonnetwork exhibition.

The financial-interest rule prohibited networks from acquiring subsidiary rights or profit shares in independently produced programs. As finally adopted, the financial-interest rule provides in pertinent part that no network shall

> acquire any financial or proprietary right or interest in the exhibition, distribution, or other commercial use of any television program produced wholly or in part by a person other than such television network, except the license or other exclusive right to network exhibition within the United States and on foreign stations regularly included within such television network. . . .

47 C.F.R. § 73.658(j)(1)(ii). In the Report and Order announcing the rules' adoption, the Commission stated that the financial-interest rule would limit the networks' potential for competitive restraint by limiting the advantage they would otherwise have in the syndication market from their existing relations with affiliates. Report and Order, *supra* note 3, 23 F.C.C.2d at 398. In the Commission's words, the financial-interest rule was necessary, "as little would be accomplished in expanding competitive opportunity in television program production if we were to exclude networks from active participation in the syndication market and then permit them to act as brokers in acquiring syndication rights and interests and reselling them to those actively engaged in syndication." *Id.*[7]

## II. *The Origins of This Case*

Over the last decade, technological developments such as satellite television, video

---

**6.** 47 C.F.R. § 73.658(k). This section provides in part:

> (k) Effective September 8, 1975, commercial television stations owned by or affiliated with a national television network in the 50 largest television markets [in terms of average prime time audience] shall devote, during the four hours of prime time (7–11 p. m. e. t. and p. t., 6–10 p. m. c. t. and m. t.), no more than three hours to the presentation of programs from a national network, programs formerly on a national network (off-network programs) other than feature films, or, on Saturdays, feature films: *Provided, However,* That

[specified] categories of programs need not be counted toward the three-hour limitation. . . .

**7.** Citing this language from the Commission's Report and Order, *supra* note 3, this court in *Mt. Mansfield Television, Inc. v. FCC*, 442 F.2d 470, 486 (2d Cir. 1971) (upholding the FCC's promulgation of the syndication, financial-interest, and prime-time-access rules), stated that "[t]he financial interest rule was deemed essential by the Commission to effectuate its syndication rule. . . ."

cassettes, and video discs, as well as the expansion of cable television, have operated to threaten, if not yet significantly reduce or altogether eliminate, the networks' domination of television programming. In November 1980, CBS Inc., one of the three leading networks, petitioned the Commission for a declaratory ruling construing the financial-interest rule "to permit CBS to acquire rights in nonbroadcast uses of a television program," which the network deemed essential to its full participation in the growing markets for home video and cable television. CBS stated in its petition that it had begun production and distribution of video cassettes, and that it planned to produce and distribute video discs and to offer advertiser-supported performing arts and cultural cable-television programming (both of which it has since begun). In each of these new businesses, CBS sought to acquire nonbroadcast rights to programs from outside suppliers including public and foreign television stations. CBS also sought to enter co-production ventures that would produce original television programs for initial exhibition on local noncommercial television stations and subsequent distribution on cable, video disc, or video cassette.

The FCC solicited comments on the CBS petition and eleven parties responded. Additional information was requested from CBS and interested parties had another opportunity to comment. American Broadcasting Companies, Inc. (ABC) and National Broadcasting Company, Inc. (NBC) and its parent corporation RCA Corporation (RCA), joined CBS in supporting a favorable inter-

pretation of the financial-interest rule. Viacom—a diversified communications company engaged in program production and syndication, in cable television, and in satellite-distributed pay television—as well as Overseas and other video and cable competitors opposed the CBS petition.

### III. The Commission's Ruling

The Commission's order of June 23, 1981 interpreted the financial-interest rule as *not* barring network acquisition of nonbroadcast interests. 87 F.C.C.2d at 35. This conclusion followed a review of the rule's history. While the Notice of Proposed Rulemaking, *supra* note 1, had indirectly mentioned network bargaining for certain nonbroadcast rights, the Commission observed that such bargaining was "never raised as a matter of concern." 87 F.C.C.2d at 35. The discussion of nonbroadcast interests, the Commission explained, arose "only in the context of a description of the rights and interests then obtained by networks." *Id.* Directly addressed in the Notice, rather, was "the Commission's concern that networks not be permitted to engage in program syndication or hold any financial interest in such syndication." *Id.*[8] The Commission pointed out that while it had relied in this rulemaking on reports by its "Network Special Staff," the rule originally recommended by the staff[9] included provisions resembling the syndication rule but not the financial-interest rule, suggesting that the financial-interest rule added later was intended to be only "an adjunct to the syndication rule." *Id.* at 36.

---

**8.** To support this interpretation, the Commission quoted extensively from the Notice of Proposed Rulemaking, *supra* note 1, 45 F.C.C. at 2158–59:

> To be more specific, the proposed rule ... is designed to alleviate the noncompetitive conditions in television program production described herein. This is sought to be accomplished by (1) eliminating network corporations from the syndication business within the United States and from the sale, licensing and distribution of independently produced television programs in foreign markets; (2) prohibiting network corporations from acquiring distribution or profit-sharing rights in syndication and foreign sales of independently produced television programs; and (3) lim-

iting economic and proprietary control by network corporations of the programs included in their schedules in desirable evening network time [prime-time-access rule]. The proposed rule, however, would preserve the right of network corporations to sell or otherwise dispose of syndication, overseas and other subsidiary rights in programs produced by them or by persons controlling, controlled by, or under common control with them and to distribute programs of which they are the sole producers in foreign markets.

**9.** The rules the staff recommended were printed in H.R.Rep.No. 281, 88th Cong., 1st Sess. App. B (1963).

In the subsequent order setting out the issues for oral argument,[10] the Commission noted, there was no mention of any prohibition against the acquisition of rights and interests in nonbroadcast uses of programming. *Id.* Nor was any such prohibition intended, according to a March 13, 1967, staff memorandum attached to the proposed version of that order. The memorandum rejected the contention in the Little Report that the financial-interest rule would prohibit networks from acquiring subsidiary rights in "merchandising and other nonbroadcast activities" as well as in syndication, although it noted that the rule's language was "possibly . . . ambiguous on this point." *Id.* at 36–37. (quoting staff memorandum).

Finally, the Commission explained that its Report and Order adopting the financial-interest rule, *supra* note 3, characterized the rule as preventing the networks from acting "as brokers in acquiring syndication rights and interests and reselling them to those actively engaged in syndication." *See id.* at 37 (citing 23 F.C.C.2d at 398). Quoting this court's decision in *Mt. Mansfield Television, Inc. v. FCC*, 442 F.2d 470, 486 (2d Cir. 1971), *see* note 7 *supra*, the Commission concluded that to interpret the rule as prohibiting network acquisition of nonbroadcast interests would be "to impose a prohibition of a type of activity not discussed in the rulemaking and not supported in the record by findings that such activities would adversely affect the public interest." 87 F.C.C.2d at 37.[11]

In a separate statement in which three other commissioners joined, FCC Chairman Mark S. Fowler stressed that the impact of the decision below would be "to increase sources of and competition in the burgeoning nonbroadcast program market," leaving the networks' success or failure in video disc, video cassette, and cable television to the marketplace rather than the Commission's meeting room. *Id.* at 38. Chairman Fowler regarded the Commission's interpretation of the financial-interest rule as correct in light of the relevant administrative history, *id.* at 38–39, and also as a prelude to the deregulation of network business practices, *id.* at 39.

## DISCUSSION

### I. Interpretative Order or Rulemaking?

Viacom argues in this petition for review that the Commission's order is contrary to the plain meaning of the financial-interest rule, which, it argues, bars networks from obtaining rights to any commercial use of independently produced television programs other than network exhibition. The Commission's interpretation, Viacom argues, is also inconsistent with the purposes of the financial-interest rule, and would have adverse effects both on the market for nonbroadcast uses of television programs (because of the networks' extraordinary bargaining leverage), and on the syndication market (because network acquisition of nonbroadcast rights helps the networks dictate syndication release dates). Viacom concludes that the Commission's order substantively amended the financial-interest rule by exempting rights to nonbroadcast uses, and therefore was improperly issued without the rule-making procedures required by the Administrative Procedure Act (APA), 5 U.S.C. § 553.

The FCC and the network intervenors[12] counter that the financial-interest rule does not on its face plainly apply to nonbroadcast uses, and thus that the Commission properly considered the rule's administrative history in construing it. That history, the FCC argues, shows that the financial-interest rule was intended solely as an adjunct to the syndication rule, not as a prohibition against network acquisition of rights

---

10. Order for Oral Argument and to Invite Further Comment, 33 Fed.Reg. 14470 (1968).

11. The Commission also noted in a footnote that "[s]ince this is an interpretation of an existing rule, the Administrative Procedure Act rule-making provisions are inapplicable." 87 F.C.C.2d at 38 n.4.

12. ABC, NBC, and RCA submitted briefs as intervenors in support of the Commission's opposition to the petition for review.

to nonbroadcast uses. The FCC concludes that the order merely clarified a theretofore unchallenged aspect of the rule, neither expanding nor contracting its scope; thus APA rule-making procedures were not required.

At the outset, we agree with the Commission that the financial-interest rule is sufficiently ambiguous to require reference to the administrative history of the rule to determine whether nonbroadcast rights in television programs were envisaged as included in the language "any financial or proprietary right or interest in the exhibition, distribution, or other commercial use of any television program," 47 C.F.R. § 73.658(j)(1)(ii). While it is true that when clear and unequivocal, the language of a statute is the best and most reliable index of its meaning, see, e.g., Diamond v. Chakrabarty, 447 U.S. 303, 315, 100 S.Ct. 2204, 2211, 65 L.Ed.2d 144 (1980); Maine v. Thiboutot, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980), it is also true that the surest way to misinterpret a statute or a rule is to follow its literal language without reference to its purpose, see, e.g., Guiseppi v. Walling, 144 F.2d 608, 624 (2d Cir. 1944) (L. Hand, J., concurring), aff'd sub nom. Gemsco, Inc. v. Walling, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945).

Nothing in the administrative history of the financial-interest rule indicates concern with network acquisition of nonbroadcast interests. The technologies and markets for cable and home video were not yet developed when the rule was adopted. Viacom argues nonetheless that the rule was implicitly intended to apply to nonbroadcast interests. Arguing that the Commission adopted the rule to counteract network bargaining leverage not just in the syndication market but in all dealings with independent producers, Viacom cites statements, reprinted in the margin, from the Report and Order [13] and from the 1972 order denying the networks' requests for a continuance of a stay of the financial-interest and syndication rules,[14] characterizing the rule as a "prophylactic measure" designed to protect against the "potential for" anticompetitive behavior by the networks. Viacom would construe such language as extending the scope of the financial-interest rule to the potential for network abuses or conflicts of interest in obtaining nonbroadcast rights.

Viewed in context, however, the Commission's statements are not open-ended references to any network abuse or conflict of interest that might happen to develop along with new technologies. Both were made, rather, in the course of discussions of network domination of the syndication market. The Commission stated that the networks' ability to condition grants of network exhibition rights upon their own receipt of syndication rights or profit shares posed such great "potential" for abuse and conflict of interest that "prophylactic" rules were necessary regardless of whether there was clear evidence of the existence of such evils.

To support the argument that the financial-interest rule was intended to extend beyond syndication practices, Viacom also

---

**13.** It appears to be, based on the testimony and especially the statistical evidence, that network judgment in choosing new programs is substantially influenced by their acquisition of subsidiary interests in the programs chosen. But in any event, even were we not to reach that conclusion, it is clear that the existence of subsidiary interests does not pose a significant conflict of interest in the selection of programing by the networks, and that as a *prophylactic* measure, the public interest would be served by the elimination of this conflict. Certainly there is a close correlation between programs taken and subsidiary rights held. We see no necessity to preserve such a conflict of interest situation.

Report and Order, *supra* note 3, 23 F.C.C.2d at 394 (emphasis added).

**14.** "Moreover, in this respect as in others, we must consider the *potential* for abuse and anticompetitive developments, as well as the actual facts shown. That there is such potential is too obvious to need elaboration." Memorandum Opinion and Order Setting Effective Dates, Amendment of Part 73 of the Commission's Rules and Regulations With Respect to Competition and Responsibility in Network Television Broadcasting, 35 F.C.C.2d 411, 418–19 (1972) (emphasis in original).

argues that the scope of the rule expanded during the time between its proposal and its adoption. Viacom concedes that the Notice of Proposed Rulemaking, *supra* note 1, expressed particular concern that the networks not be permitted to engage in program syndication or hold any financial interest in such syndication. *See* note 8 *supra.* It contends, however, that the focus broadened when the language of the rule was changed from prohibiting any financial or proprietary interest "in the program or distribution thereof," *see* Appendix A to Notice of Proposed Rulemaking, *supra* note 1, 45 F.C.C. at 2164, to "in the exhibition, distribution, *or other commercial use* of" the program, *see* Appendix I to Report and Order, *supra* note 3, 23 F.C.C.2d at 402 (emphasis added). Parallel to this change, Viacom argues, was the change in the Commission's description of the rule as prohibiting networks from acquiring "profit-sharing rights in syndication and foreign sales of independently produced television programs," Notice of Proposed Rulemaking, *supra* note 1, 45 F.C.C. at 2158, *quoted in* note 8 *supra,* to "prohibiting networks from acquiring *additional rights* in programs independently produced and licensed for network showing." Report and Order, *supra* note 3, 23 F.C.C.2d at 382 (emphasis added).

We do not read these changes as enlarging the scope of the financial-interest rule. If anything, the "commercial use" language would appear to have narrowed the rule. It is clear in any case that the Commission thought this change insignificant. Although the Report and Order announced substantial modification of the prime-time-access rule from its proposed form, it made no mention of any alteration in the syndication or financial-interest rules.[15] And it reiterated the Commission's predominant concern about the networks' excessive leverage in the syndication market. *See, e.g.*, Report and Order, *supra* note 3, 23 F.C.C.2d at 388 (independent producers forced to "bargain away substantial portions of domestic and foreign syndication rights" to the networks); *id.* at 392 (networks obtaining increasing share of syndication market); *id.* at 397–98 (independent producers who wish to exhibit first and syndicate later must "grant to the networks either the distribution rights or large shares in the profits from domestic syndication and foreign distribution, or both"). The "additional rights" language is most plausibly read as shorthand for the indirect rights in syndication and foreign distribution at which the financial-interest rule had always been aimed.[16]

In short, we find nothing in the administrative history of the financial-interest rule to suggest that the Commission ever departed from the position that the rule was "essential . . . to effectuate [the] syndication rule," *see Mt. Mansfield Television, Inc. v. FCC*, 442 F.2d at 486, but was not intended to "prohibit network managers from ac-

---

**15.** For the reasons set forth below we have decided to adopt our proposed rules with respect to syndication and subsidiary rights in independently produced network programs, and what is essentially the Westinghouse proposal [for a prime-time-access rule]. Both our original proposal limiting network produced programs to 50 percent of the evening network schedule and the Westinghouse proposal were designed to restrain network domination of nighttime television. . . . We have . . . decided to hold the 50/50 proposal in abeyance for the time being. . . .

Report and Order, *supra* note 3, 23 F.C.C.2d at 383–84.

**16.** *See, e.g., Order for Oral Argument, and to invite Further Comment, supra* note 10, which stated the following purposes of the proposed rules:

(1) restrict the direct financial and proprietary control exercised by networks over their evening programming in order to open up some prime time on each network for programs controlled by persons other than networks; (2) prohibit networks from engaging in domestic syndication and from distribution in foreign markets of programs which were produced by others; (3) prohibit networks from acquiring syndication and foreign distribution rights in network programs not produced by them; and (4) require networks to divest themselves of the present syndication and foreign distribution rights and interests of the types they would be prohibited from acquiring under the new rule.

33 Fed.Reg. at 14470–71.

quiring exploitation and profit shares in 'merchandising and other nonbroadcast activities,'" *see* Memorandum Opinion and Order, 87 F.C.C.2d at 36–37 (quoting staff report's rebuttal of Little Report). Nor do we find any other Commission interpretation of the financial-interest rule inconsistent with the conclusion reached below.[17] We hold that the Commission's Memorandum Opinion and Order interpreting the rule was supported by the administrative record.

■ We therefore agree with the Commission, *see* Memorandum Opinion and Order, *id.* at 38 n.4, that its ruling was not a rule-making but an interpretation of an existing rule, and did not require adherence to the rule-making procedures of the APA, 5 U.S.C. § 553. *See Chisholm v. FCC*, 538 F.2d 349, 364–66 (D.C.Cir.), *cert. denied*, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976). The choice between rule-making or declaratory order is primarily one for the agency regardless of whether the decision may affect policy and have general prospective application, *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 291–95, 94 S.Ct. 1757, 1770–72, 40 L.Ed.2d 134 (1974); *see SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947), and an agency's conclusion that its order is interpretative "in itself is entitled to a significant degree of credence," *British Caledonian Airways, Ltd. v. CAB*, 584 F.2d 982, 992 (D.C.Cir.1978). Certainly interpretation of regulations by declaratory ruling is "well within the scope of the familiar power of an agency. . . ." *Trans International Airlines, Inc. v. CAB*, 432 F.2d 607, 612 n.9 (D.C.Cir.1970).

Viacom and Overseas did not sustain any prejudice from the FCC's proceeding by way of interpretation below. The Commission gave substantial public notice and opportunity for comment and argument. *See Chisholm v. FCC*, 538 F.2d at 365 ("empty formality [of rule-making] is not required"); *Office of Communication of the United Church of Christ v. FCC*, 590 F.2d 1062, 1070 (D.C.Cir.1978). And the interpretation did not "change[ ] existing rights and obligations" as in *Lewis-Mota v. Secretary of Labor*, 469 F.2d 478, 482 (2d Cir. 1972); whether or not network acquisition of nonbroadcast rights, which the Commission's decade-old analysis of the syndication market never addressed, will have any anticompetitive effect on television program production is a matter for future factual determination.

## II. *Internal Staff Memorandum*

■ Viacom objects to the Commission's failure to make publicly available, before release of its ruling, the March 1967 staff memorandum that stated that "[t]he proposed rule would not prohibit network managers from acquiring exploitation and profit shares in 'merchandising and other nonbroadcast activities,'" *quoted in* Memorandum Opinion and Order, 87 F.C.C.2d at 36–37. While disclaiming "routine" reliance on staff memoranda, *id.* at 37, the Commission relied on this memorandum, devoting to it a page of the opinion below, to help ascertain the intent of the drafters of the financial-interest rule.

This reliance, however, did not violate the Administrative Procedure Act, 5 U.S.C. § 552(a)(2),[18] as Viacom claims. The staff

---

**17.** *See, e.g.,* Commercial TV Network Practices, 70 F.C.C.2d 1443, 1446 n.4 (1979) (the rule's purpose is "to assure ourselves that the networks could not *indirectly* engage in practices that they were *directly* prohibited from continuing under [the syndication rule]" (emphasis in original)); Columbia Picture Industries, Inc., 30 F.C.C.2d 9 n.1 (1971) (in addition to prohibiting network syndication, section 73.-658(j) prohibits the acquisition by the networks of "any interest other than the right to network exhibition" in independently produced programs, with the purposes of freeing the networks from conflicts of interest in choosing

programs for network exhibition, and diminishing network control of program production and distribution). It is perhaps ironic that the latter decision, on which Viacom now relies, was a decision approving the spinoff of Viacom from CBS so that CBS could comply with the syndication rule and other rules, not at issue here, prohibiting cross-ownership of networks and cable television. In any event, the footnote was a simplification of the syndication and financial-interest rules, not binding in the context of nonbroadcast interests.

**18.** 5 U.S.C. § 552(a)(2) provides in part:

memorandum was neither "made in the adjudication of cases," *id.* § 552(a)(2)(A), nor a "statement of policy" or "interpretation" that was "adopted by" the FCC, *id.* § 552(a)(2)(B), nor a "staff manual or instruction," *id.* § 552(a)(2)(C). It was, rather, an internal analysis of proposed rules by agency staff. Thus it need not have been disclosed prior to the ruling.[19]

### III. *Ex Parte Communications*

■ Viacom also contends that ex parte communications between the networks and the Commission's members and staff, heavily reported in the industry press,[20] should have been publicly disclosed. Failure to

disclose ex parte contacts is a sore point with many judges, including the author of this opinion. *See Morningside Renewal Council, Inc. v. United States Atomic Energy Commission*, 482 F.2d 234, 239, 241 (2d Cir. 1973) (Oakes, J., dissenting), *cert. denied*, 417 U.S. 951, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974). *See also id.* at 954, 94 S.Ct. at 3082 (Douglas, J., dissenting from the denial of certiorari). Nonetheless, we do not find the Commission's rules against ex parte contacts, 47 C.F.R. §§ 1.1201–.1251, applicable to the ruling below, which was not a rule-making or an adjudication but an interpretation of an existing rule.[21]

> Each agency, in accordance with published rules, shall make available for public inspection and copying—
> (A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;
> (B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register; and
> (C) administrative staff manuals and instructions to staff that affect a member of the public;
> ... A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if—
> (i) it has been indexed and either made available or published as provided by this paragraph; or
> (ii) the party has actual and timely notice of the terms thereof.

**19.** The Commission did make the memorandum available to Viacom after release of the ruling, but Viacom did not file a petition for reconsideration to raise any objections to it. *See Hercules, Inc. v. EPA*, 598 F.2d 91, 129 (D.C.Cir. 1978).

**20.** A page one banner-headlined story in *Variety* on December 10, 1980 said in part:
> CBS confirmed that it discussed the move—both for ownership and programming for cable—with all commissioners and key staff members long before the recent filings.
> ....
> ... [B]oth CBS and FCC chairman Charles Ferris say there's no sweat, the whole thing's been greased.
> "We've put it on a fast track," said Frank Lloyd, assistant to Ferris. Comments are due Dec. 22 and "we hope to have a rule on it in January," Lloyd said.

> Ferris has argued publicly that the webs should be encouraged to program for cable and homevideo, insisting that a "reasonable" interpretation of the network financial interest rule would not preclude it.
> CBS was not the only party lobbying the Commission, however. A subsequent (June 10, 1981) story in the same newspaper said:
> "CBS assured us that everything was locked up," said one web exec. "But they didn't know what they were talking about."
> The first sign that the fast track had turned to sludge came last April 9 when the commission haggled over the petition for a short time, first rejected it, then in a compromise asked for some further justification from CBS.
> Ever since then the industry has been in a quandary. Cable companies such as HBO, Teleprompter, Viacom, etc., wanting to keep the networks outside the cable tent, have been lobbying the commission just as strongly as the networks. The major Hollywood production companies, fearing that the broadcast and non-broadcast rights clout for the webs would put them at a disadvantage, apparently are trying to arrange some sort of protection from the commission should the vote go against them.
> As for the networks, after a few days of kicking the CBS Washington office around, they have closed ranks, brought the National Assn. of Broadcasters and RCA into the picture, hired consultants, prepared studies and all the rest.
> ....
> "We haven't done any lobbying" at the FCC, said CBS Washington veep Bill Lilly, since originally filing the petition. "The other networks have been handling that and they've done a good job."

**21.** The Commission's ex parte prohibitions apply only to rule-making proceedings and to adjudicative proceedings designated for hear-

Nor do we find the circumstances of this ruling covered by *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 57 (D.C.Cir.) (ex parte procedural rules apply to all "informal official action allocating valuable privileges [such as the right of subscription broadcast TV stations and CATV operators to exhibit for a fee certain programs] among competing private parties"), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). The District of Columbia Circuit has confined *Home Box Office* to cases involving competing claims for a specific valuable privilege under circumstances similar to adjudication. *See Sierra Club v. Costle*, 657 F.2d 298, 402 (D.C.Cir.1981); *Action for Children's Television v. FCC*, 564 F.2d 458, 477 (D.C.Cir. 1977). Petitioners and the networks do not here compete for a specific valuable privilege within the Commission's power to grant.

In any case, there is on the record nothing to suggest that the Commission's decision was "materially influenced" by the networks' ex parte communications. *See id.* at 478. Indeed if we are to believe the news stories, *see* note 20 *supra*, Viacom and other parties opposed to the networks' position were equally ardent in their wooing of the Commission in the parlor rather than in the hearing rooms.

### IV. *Arbitrary and Capricious Standard*

Viacom's last argument—that the Commission's ruling was arbitrary, capricious, and an abuse of discretion that must be set aside under 5 U.S.C. § 706(2)(A)—is essentially a rehash of the argument that the ruling embodied a change of policy that should have been subject to rule-making, or at least a reasoned opinion demonstrating reasons for the change proposed, *see Office of Communication of the United Church of Christ v. FCC*, 560 F.2d 529 (2d Cir. 1977). As we have said, however, we view the case, as did the Commission below, as one involving not a change of policy but an interpretation of a rule as never having

ing. 47 C.F.R. § 1.1203(a), to licensing proceedings in which a petition to deny or a mutually exclusive application has been filed, *id.*

prohibited the networks' acquisition of nonbroadcast rights.

Petition to review denied.

§ 1.1207, and to specified cable television matters, *id.* § 1.1231.